**Opinion issued March 5, 2020.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00612-CV

———————————

### IN THE INTEREST OF A.A.H a/k/a A.H.

———————————

## NO. 01-19-00748-CV

———————————

### IN THE INTEREST OF A.M.H-F., A.L.F., A.C.J.H.-M., A.P.J.H.-M. and A.C.H.-M.

---

**On Appeal from the 310th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-59296 & 2017-65076**

---

## MEMORANDUM OPINION

K.H. ("Mother") and A.J.M. ("Father") are appealing a final decree terminating their parental rights to their infant daughter, A.H. ("Alexa"). Mother

also appeals a separate final decree terminating her parental rights to her five older children. In several issues, Mother and Father both argue on appeal that there is legally and factually insufficient evidence supporting the trial court's findings that: (1) they committed the requisite predicate acts under subsections 161.001(b)(1)(D), (E), and (O) and (2) termination of their parental rights is in the children's best interests. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), (O) & 161.001(b)(2). In several additional issues, Mother contends that (1) there was legally and factually insufficient evidence to support the appointment of the Department of Family and Protective Services ("The Department") as sole managing conservator, (2) she was denied due process and equal protection, (3) the trial court lacked jurisdiction because it did not commence trial within the statutorily required time, (4) she received ineffective assistance of counsel, and (5) the trial court erred in denying an intervention by a potential relative seeking placement in violation of the Fostering Connections Act. In cause number 2018-59296, we affirm the termination decree as to Father but reverse and remand as to Mother. In cause number 2017-65076, we affirm the termination order.

## I. BACKGROUND

Mother has six children. At the time of trial, the eldest was nine years old and the youngest was an infant. Adam Fields, deceased, is the father of the two

eldest children, Anna and Bryan.[1]  Father is the father of the second oldest daughter, Catherine.  Johnathan Adams is the father of Deborah and Elijah.  And, Father is also the father of the infant, Alexa.

In July 2017, the family came to the Department's attention when it received a referral for medical neglect; the middle daughter, Catherine, had suffered severe burns caused by boiling noodles, and Mother had not sought any medical treatment for her.  Mother took a drug test on July 17, 2017, in which she tested positive for cocaine in an amount indicating that she was a chronic user.  In October 2017, when Mother continued to test positive for drugs, the Department was appointed Temporary Managing Conservator of Anna, Bryan, Catherine, Deborah, and Elijah.[2]  However, there is evidence that Mother concealed the children, and the Department was unable to locate them and take custody of them until January 26, 2018.

The infant, Alexa, was born August 23, 2018.  On August 29, 2018, the Department received a referral alleging neglectful supervision of Alexa by Mother. Father was in jail at the time of Alexa's birth.

---

[1]    For purposes of this Opinion, we will refer to the children and parties by pseudonyms.  *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8.

[2]    The Department's case involving Mother and the five eldest children is trial court number 2017-65076, appeal number 01-19-00748-CV.  Father was also a party to that suit, but he filed a relinquishment of parental rights as to his older daughter, Catherine, in that case and does not appeal. The Department's case involving Alexa is trial court number 2018-59296, appeal number 01-19-00612-CV.

On August 30, 2018, Department investigator, Sheryl Ross, went to the apartment where Mother was staying with her sister and fictive kin, whom she referred to as her grandfather, but Mother said that the baby was not there. The Department was not able to locate Alexa until September 11, 2018, when it was named temporary managing conservator. Mother again tested positive for cocaine on that date.

## A. TRIAL PROCEEDINGS

### 1. April 9, 2019

Both cases—2017-65076 involving the older children and 2018-59296 involving the infant—were called to trial. Father was represented by Michael Craig. The Department was represented by De'Anna Carlson. Mother's attorney in the 2018 case, Gary Smotherman, was not present and the record provides no explanation for his absence. Mother's attorney on the 2017 case, Jimmie Brown, Jr., appeared on her behalf.

Father's attorney called Father, who testified that he wished to execute a Voluntary Relinquishment of Parental Rights as to Mother's third child, Catherine. Father testified that he understood the consequences of his action, that it was irrevocable, and that it was in Catherine's best interest. The trial court admitted the document into evidence without objection. Father did not execute a relinquishment as to Alexa.

4

The trial court then recessed the trial because Mother had alleged that her children might be of Native American descent and that more time was needed to comply with the protections provided by the Indian Child Welfare Act of 1978. *See* 25 U.S.C. §§ 1901—1963 (2001).

**2. June 25, 2019**

**a. The Motion to Withdraw**

Trial resumed on June 25, 2019. Again, Gary Smotherman was not present for Mother in the 2018 case and there is no explanation in the record for his absence. Jimmie Brown, Jr. appeared on Mother's behalf in the 2017 case, but he filed a Motion to Withdraw, alleging "a pretty much unavoidable conflict of interest." After a brief discussion off the record, the trial court denied Brown's motion. Brown then stated on the record,

> Based on what has occurred between my client and myself, Counsel will be basically ineffective. And I think that will render this proceeding pretty much constitutionally [infirm]. I don't know of any other way that I can proceed and not prejudice my client one way or another. And I don't know how I can do this and be faithful to the rules that I'm sworn to uphold. So[,] all I can honestly tell the Court is that I will be ineffective on the record.

**b. Evidence**

The Department proceeded by offering numerous exhibits, including the children's birth certificates, the parents' family service plans, the parents' drugs tests, and the parents' criminal records.

### i. Bruce Jefferies's testimony

The first witness was Bruce Jefferies, the owner of the National Screening Centers, who testified about Mother's and Father's drug tests. The evidence showed that Mother first tested positive for cocaine on July 17, 2017, at which time her cocaine levels indicated daily "chronic" use. On February 6, 2018, Mother tested positive for a low amount of ingested marihuana, a chronic "daily" exposure to marihuana, methamphetamine, and cocaine at a chronic usage level. This test was after the Department had removed Mother's older children and Mother was pregnant with Alexa at the time.

On February 27, 2018, Mother tested positive for cocaine, PCP, marihuana, and codeine. Her cocaine level had dropped, her marihuana levels were low, but she had new positive results for PCP and codeine. Jeffries explained that the codeine could be explained by a prescription drug. Mother never produced or claimed to have a prescription.

On July 17, 2018, Jefferies could not take a sample of hair from Mother's head because it had been shaved and she was wearing a weave.

On July 19, 2018, a little over a month before Alexa's birth, mother tested positive for cocaine.

On September 11, 2018, a few weeks after Alexa was born, Mother tested positive for cocaine again.

On October 23, 2018, Mother tested positive for alcohol, methamphetamine, cocaine, and PCP. Jefferies noted that Mother was still testifying positive, even while she was participating in a substance-abuse program.

On November 27, 2018, Mother again tested positive for cocaine.

On February 20, 2019, just a few weeks before trial, mother tested positive for a low amount of cocaine, daily exposure to marihuana, and a low amount of marihuana ingestion.

Jeffries also testified about Mother's drug tests by Texas Drug and Alcohol Services, which showed that (1) Mother's earliest drug test—July 17, 2017—which was before any of her children were removed, showed chronic or daily use of cocaine, (2) on August 31, 2018, just a few days after Alexa's birth, mother tested positive for cocaine, and (3) on October 10, 2018, Mother again tested positive for cocaine.

Jefferies also testified about Father's drug tests as follows:

On March 1, 2018, Father tested positive for PCP and marihuana, both by exposure and ingestion.

On February 19, 2019, just a few weeks before trial, Father tested positive for marihuana ingestion at a chronic usage level, codeine and morphine, PCP at a chronic usage level, low levels of alcohol, and methamphetamine at a level indicating usage more than once.

7

## ii. John Fuegar's testimony

The next witness was John Fuegar, the Department's case worker in both the 2017 and 2018 cases. Fuegar testified that all six children were currently in foster care. The three eldest children—Anna, Bryan, and Catherine—were in the same foster care placement. All three were in therapy and were "doing well." The placement was not a potential adoptive placement.

The next two children—Deborah and Elijah—were placed in a foster home together and they too were doing well and were attending daycare regularly. The placement was not a potential adoptive placement.

Finally, the infant, Alexa, was placed in a foster home and was the only sibling placed alone. Her foster mother arranged for her to visit her siblings. Despite being exposed to illegal drugs in utero, Alexa had experienced no developmental delays. Alexa's foster mother was willing to adopt both her and Catherine.

Fuegar testified about other potential placements for the children. He testified that Adam Field's family was willing to take Anna and Bryan, who were their deceased relative's children. Fuegar also testified that the Department had identified one family who was willing to adopt all six children if the parents' rights were terminated. So, Fuegar concluded that the Department would be able to locate permanent placements for all six of the children. Fuegar testified that the older

children currently had some hesitation about being reunited with their younger siblings because they feared they might once again be "in charge" of the younger children.

Regarding Catherine's burns, which led to the initial Department referral, Fuegar testified that the Mother explained that noodles had spilled on the child. Upon initial investigation, the Department's investigator noted that the burn smelled and was possibly infected. The burn covered the child's lower abdomen, pelvic area, and upper legs. Mother did not seek any medical treatment for Catherine, and her scarring is such that she will need skin grafts in the future. Fuegar testified that the Department classified Mother's failure to seek treatment for Catherine as medical neglect. He also testified that Mother told the other children that they could not take Catherine to the doctor because the doctor would cut her legs off.

Fuegar testified that the Department was appointed temporary managing conservator of the older children on October 31, 2017 but was not able to take custody of them until January 2018. It was his belief that Mother was hiding the children. When the children were removed in January 2018, the apartment in which they were staying had no heat or water.

Mother was given, and signed, a family service plan at a February 6, 2018 hearing in the 2017 case. In accordance with the plan, Mother attended her

psychological assessment, at which the following recommendations were made: participate in a substance abuse program, maintain sobriety for one year, comply with random drug testing, attend counseling, attend parenting classes, maintain financial support with employment, maintain housing, avoid illegal activities, and maintain a drug free home. She was also diagnosed with personality disorder.

Before Fuegar completed his testimony, trial was recessed.

**3. July 1, 2019**

Trial resumed on July 1, 2019. The Department again noted on the record that Mother's attorney in the 2018 cause number, Gary Smotherman, had been noticed, but did not appear. Again, no explanation for his absence is found in the record.

Also appearing for the first time was, Danielle Green, pro se. Green had filed an intervention in the proceedings, seeking to be considered as a placement for Johnathan Adams's children, Deborah and Elijah. Green also had children by Adams, who were half-siblings with Deborah and Elijah. Mother indicated a willingness to relinquish her parental rights to all six children to Green.

**a. Evidence Continued**

*i. John Fuegar's testimony*

The Department resumed questioning of the caseworker, Fuegar. Fuegar testified that Mother failed to complete her family service plan. Specifically, she

did not provide proof of stable housing, she did not refrain from illegal activities, and she did not submit to random drug testing over ten times. She also failed to comply with the recommendations of her psychological assessment that she by remain sober for one year or submit to another substance abuse assessment. Fuegar also testified that she never provided the Department with proof of employment or stable housing. Although Mother successfully completed outpatient treatment for drug abuse, she continued to test positive for drugs both before, during, and after completion of the program. Fuegar concluded that Mother's continued drug use endangered her children by exposing them to criminal conduct and preventing her from being available for the children. Specifically, Fuegar stated, "[I]f the parent goes to jail, they're not able to provide a stable environment for the child. They're not able to meet the basic needs of the child because they are separated from the child." Fuegar specifically noted that Mother tested positive for drugs throughout her pregnancy with Alexa.

After learning that Alexa had been born, Fuegar visited Mother, but Mother said the baby was not there. She claimed that the baby, who was just days old, was with her sister, Leslie Hawkins, and Mother did not know where they were. The Department finally located Alexa on September 11, 2018. Mother tested positive for drugs that day, and the Department was made temporary managing conservator.

The Department was concerned that Mother continued to test positive for drugs even after Alexa (and the other children) had been taken into the custody of the Department. Fuegar stated, "It goes to the ability of the parent to provide the child—to produce a safe environment for the child in the future."

Mother was given a family plan on the 2018 case, which she also failed to complete. She never took anger management classes. She never provided proof of stable, ongoing employment, although there was evidence that she had obtained her phlebotomist certification. She did not submit to random drug testing. She continued to engage in criminal activity, and she missed court hearings in the case.

Mother did attend her supervised visits with Alexa and behaved appropriately during them.

Regarding potential placements, Mother suggested her great-grandmother, Pamela Gardner. The Department denied this placement because of concerns about Gardner's ability, both physically and financially, to care for six children. The Department was also concerned that Gardner would allow Mother access to the children. Mother also suggested her sister, Amber Hawkins, but the Department ruled her out because she too had a criminal history as well as a history with the Department. Mother's brother, Elijah Hawkins, never returned the Department's calls when they sought to perform a home study on him. Mother's uncle, Shawn Hawkins, was also not considered because he had a criminal history. Finally,

mother suggested fictive kin, Ushanda Collins, who was not considered because she was not willing to participate in the home-study process.

Fuegar noted that the Department had considered several family members of the deceased father, Adam Fields, who were interested in having Anna and Bryan placed with them and that a home study had been done but had not yet been approved or denied.

Danielle Green, whose children share a father with Deborah and Elijah, was also interested in having the children placed with her, even though she had never met them. Fuegar testified that the Department would consider a placement with Green.

Fuegar also testified about a potential placement for all six children. A home study had been done, and the family had been approved as an adoptive placement. The eldest child, Anna, had some trepidation about the potential placement and "her main concern [was] being embarrassed about not looking like her adoptive family." She was also concerned about having to take care of the other children if she were placed in a family with all six of them.

Finally, Fuegar testified that Alexa's current foster mother was willing to adopt both her and Catherine. Alexa's foster mother would be open to maintaining a relationship with the other siblings.

13

Regarding Father, Fuegar testified that Father was in jail from December 2017 until November 22, 2018. Thus, he was in jail when the Department took custody of his oldest child, Catherine, in January 2018, and when Alexa was born in August 2018. He did not see Alexa until she was six or seven months old.

Fuegar met with Father in November 2018, when he was released from jail, at which time, Father was given a family service plan. Father did not complete his family service plan.[3] He did not go to a psychiatric assessment; he did not show up for random drug testing; he continued to engage in criminal activity by using drugs; and he did not provide proof of housing or employment. Father tested positive for drugs in February 2019, shortly before trial commenced. Father attended a drug assessment, but he did not comply with the recommendations from that assessment. Specifically, he did not submit to random drug testing.

The Department was concerned about Father's drug use and that his continued engagement in criminal activity had led him to be absent from Catherine's life, as well as the life of his newborn child, Alexa.

Fuegar also expressed concerned about Father's extensive criminal record, noting that "[a] parent who is incarcerated is not able to protect their child. They're not able to ensure that their child's needs are being met and it takes away

---

[3] The family service plans for Father were the same in the 2017 case and the 2018 case.

14

all ability for them for being present in their child's life and being a caregiver for them."

Fuegar noted that Father had made regular, appropriate, supervised visits with Alexa, though he missed one appointment when he overslept. Though Father would like to leave permanent managing conservatorship of Alexa to the agency or foster parent, the Department wanted her to have permanency. Father had never provided anything for Alexa other than a piece of hard candy that he brought to one of the supervised visits.

Fuegar testified that the Department was also concerned about domestic violence in the relationship between Mother and Father. Mother had reported that she was the victim of domestic violence at Father's hands. This violence was said to have occurred before he went to jail in December 2017, and it happened on more than one occasion.

Fuegar concluded that it would be in the best interest of all six children if Mother's and Father's parental rights were terminated.

### ii. Anabel Gonzalez's testimony

Anabel Gonzalez testified that she was the Department's investigator on the 2017 case involving the five older children. She received a referral for the family on July 12, 2017, alleging drug use and medical neglect with respect to Catherine. Gonzalez visited the family on July 14th, 2017, and saw Catherine's burns, which

were healing by that time. She asked Mother to take a drug test, Mother did not do so for a couple of weeks. She finally took one on July 17, 2017, which showed chronic cocaine use.

During this initial investigation, Gonzalez contacted Father on July 13, 2017. Father said that he was living in Beaumont with his father. He denied knowing anything about the children, including that Catherine had been burned.

The Department filed its Original Petition in September 2017, and, at a hearing of October 17, 2017, was granted emergency custody. The Department was unable to locate the children to obtain custody until January 26, 2018. Gonzalez testified that she went to the children's' schools and reached out to family members, "but nobody had any information as to where they were[.]" Gonzalez even went to Mother's criminal court setting to try and find her, and the judge in that case ordered Mother to produce the children.

The Department was concerned about placing the children with relatives because there was concern that they were helping Mother hide the children. Mother's sister's children were also missing, and the sister was eventually charged with kidnapping.

When the children were finally located, Gonzalez stated that they were with a babysitter, and the home did not have heat or running water, even though it was January. Gonzalez testified that the apartment was filthy, there were clothes

everywhere, and there was "dog feces all over the place." When they were located, it was during school hours, and, even though two of the children were school-aged, they were not in school.

### iii. Danielle Green's testimony

Green testified that two of her own children were siblings with Deborah and Elijah because they shared the same father, Jonathan Adams. She testified that Adams asked her whether she would "take care of the kids." Green called Mother and told her that she "wanted to step in and take temporary custody of [her] children until [she] finish[ed] whatever [she] had going on with the court." Mother agreed and attempted to relinquish her children to Green. Green agreed to take all six children. Green testified that, if the children were placed with her, she "wouldn't have a relationship with the mother per so. It would be more-so as visits possibly."

### iv. Father's testimony

Father's counsel stated, "Despite my advice, Your Honor, I'm going to call my client." Father acknowledged that he had filed an affidavit of relinquishment as to his older child, Catherine, but he testified that he did not want his parental rights to Alexa to be terminated. He testified that he was working and making $12.38 per hour and that he could pay support for the child. He testified that he had been living with his mother and visiting Alexa regularly. He said that he loved

17

the child and that he was asking the trial court not to terminate his rights so that he could pay support and continue to visit.

Father admitted that he committed domestic violence against Mother in the past, before invoking his Fifth Amendment rights, and, on advice of counsel, refusing to answer further questions on the issue. Father acknowledge spanking the children, "[w]hen they did stuff that they wasn't supposed to[.]"

Father testified that he knew that Mother had smoked "a little marijuana," but that the children were not with her at the time. He believed that Mother took good care of the children; he did not know that they went without electricity and water, stating, "I was incarcerated." He also claimed that he was in jail when Catherine was burned.

Father admitted using drugs as late as April 2019, which was just before trial commenced. He said that his drug of choice was PCP. He said that he did not see Catherine until several months after she was burned, at which time the wounds were healing, so he did not take her to the doctor.

*v. Mother's testimony*

Mother testified, but the questioning was limited to the identity of the eldest children's deceased father, Adam Fields.

## B. THE TERMINATION DECREES

After trial, the trial court signed orders terminating Mother's parental rights to all six children based on the predicate acts in subsections (D) (endangering conditions), (E) (endangering conduct), (N) (constructive abandonment), (O) (failure to comply with court order), and (P) (using controlled substances after completion of court-ordered substance abuse treatment) of Family Code section 161.001(b)(1). The trial court ordered termination of Father's parental rights to Alexa under subsections (D) (endangering conditions), (E) (endangering conduct), and (O) (failure to comply with court order) of Family Code section 161.001(b)(1). The trial court also found that termination of their parental rights was in the children's best interest under Family Code section 161.001(b)(2). This appeal followed.

Because there are two termination orders, we first address the issues in 2018 case involving the Mother, the Father, and Alexa. Then, we will address the issues in the 2017 case involving Mother and her five eldest children.

**II. CAUSE NO. 2018-59296**

**A. SUFFICIENCY OF THE EVIDENCE[4]**

In issue one through four of his appeal, Father argues that there is legally and factually insufficient evidence supporting the trial court's findings that he committed the predicate acts under subsection 161.001(b)(1)(D), (E), and (O) and that termination of his parental rights is in Alexa's best interests. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), (O), 161.001(b)(2). In issues four, five, and six of her appeals, Mother raises the same challenges.

### 1. Standard of Review

Protection of the best interest of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Accordingly, we strictly

---

[4] When a party presents multiple grounds for reversal, an appellate court should first address those issues that would afford the party the greatest relief. *Bradley's Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999). Because legally insufficient evidence requires a rendition, we address the parties' sufficiency issues first.

scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

In a case to terminate parental rights under Texas Family Code section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362.

When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under section 161.001(b)(1) and that termination was in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d at 266. In doing so, we examine all the evidence in the light most favorable to the finding, assuming the "factfinder

21

resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* We must also disregard all evidence that the factfinder could have reasonably disbelieved or found to be incredible. *Id.*

When conducting a factual sufficiency review, we consider and weigh all the evidence including disputed or conflicting evidence. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

### 2. Sections 161.001(b)(1)(D), (E)

In his second issue, Father argues that there is legally and factually insufficient evidence that he committed a predicate act under either subsection 161.001(b)(1)(D) or (E). In her fourth issue, Mother raises the same argument.

#### a. Applicable Law

Subsection 161.001(b)(1)(D) requires the trial court to find by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or

22

emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Subsection 161.001(b)(1)(E) requires the trial court to find by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E). Subsections (D) and (E) differ in that (D) requires a showing that the environment or *conditions* in which the child is placed endangered the child's physical or emotional well-being, while subsection (E) requires that the cause of the endangerment be the parent's *conduct* alone, as evidence by either the parent's actions or omissions. *Id.* § 161.001(b)(1)(D), (E). However, inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his or her home is part of the "conditions or surroundings" of the child's home under section (D). *In re B.R.*, 01-13-00023-CV, 2013 WL 3243391, at *5 (Tex. App.—Houston [1st Dist.] June 25, 2013, no pet.) (mem. op.). Thus, even though subsection (D) focuses on the child's living environment, "parental conduct may produce an endangering environment." *Id.* "Because subsections D and E both concern endangerment and the evidence on each may overlap in some respects, we address both of these predicate findings together." *In re S.R.*, 452 S.W.3d 351, 359–60 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

As used in section 161.001, "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). In this context, endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical well-being. *Id.*; *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996).

The Department does not need to establish that a parent intended to endanger a child to support termination based on endangerment. *See In re M.C.*, 917 S.W.2d at 270. Nor is it necessary to establish that the parent's conduct was directed at the child or caused actual harm; rather, it is sufficient if the parent's conduct endangers the child's well-being. *See Boyd*, 727 S.W.2d at 534; *Walker v. Tex. Dep't of Fam. & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.— Houston [1st Dist.] 2009, pet. denied). Danger to a child's well-being may be inferred from parental misconduct. *Boyd*, 727 S.W.2d at 533. "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied).

A parent's past endangering conduct may support an inference that past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See id.*

24

The court's endangerment analysis also includes consideration of a parent's criminal record and how repeated criminal activity adds instability to the child's life with repeated parental incarceration and separation. *See Boyd*, 727 S.W.2d at 533 (stating that "imprisonment is certainly a factor to be considered by the trial court on the issue of endangerment"). While "mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child," "if the evidence, including the imprisonment, shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding [under Subsection] (E) is supportable." *Id.* at 533–34; *see In re V.V.*, 349 S.W.3d 548, 555 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc) (affirming termination of father's parental rights for endangering conduct, noting his "extensive criminal history," repeated "criminal conduct leading to incarceration before and after the child's birth," "life of crime" that included four felonies as well as "assault and other crimes against the person," "no effort to care for his daughter when not incarcerated," and "irresponsible choices that deprived this child of a parent").

### b. Analysis as to Father

Father argues that his criminal history and multiple incarcerations did not endanger Alexa. He points out that all incarcerations occurred before Alexa's birth and that he had not incurred any new criminal charges since.

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *In re A.L.H.*, 515 S.W.3d at 92. Among the types of actions or omissions constituting evidence meeting this standard are criminal activity, convictions, and incarceration. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.). Routinely subjecting children to the probability that they will be left alone because their parent is in jail endangers children's physical and emotional well-being. *See Walker*, 312 S.W.3d at 617. Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533–34.

The record contains evidence of 20 criminal convictions, for which Father has been sentenced to varying terms of confinement. His criminal record began in

2005; his most recent conviction was in 2018, a few months before the birth of his youngest child, Alexa. The record shows that, not only was he confined when Alexa was born and when Catherine and Alexa were, separately, removed from Mother's care, Father testified that he was confined when Catherine was burned. Father has been sentenced to a period of confinement at least once, every year since 2005, except for 2007, when he was already in jail, and in 2010, just after completing a sentence that began in 2009. His convictions include theft, three unlawful-weapons convictions, five drug-possession convictions, two evading-arrest convictions, burglary, two trespass convictions, two criminal mischief convictions, and two unauthorized-use-of-a-vehicle charges. [5]

More importantly, however, Father has two convictions for assault of a family member. His second family-violence conviction was against Mother, and, at trial, Father admitted assaulting Mother. Domestic violence and a propensity for violence are likewise evidence of endangerment. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th

---

[5] Father argues that his criminal convictions and incarcerations occurred before Alexa was born. However, courts may look to evidence of parental conduct both before and after a child's birth and before and after a child's removal from the home to determine whether termination is appropriate. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citing *In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied)); *Walker v. Tex. Dep't of Fam. And Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (explaining that relevant conduct may occur either before or after child's removal from home).

Dist.] 2003, no pet.); *accord S.R.*, 452 S.W.3d at 361. Violence does not have to be directed toward the child or result in a final conviction—"Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." *In re V.V.*, 349 S.W.3d at 556. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d at 845; accord *S.R.*, 452 S.W.3d at 361. Parents' criminal conduct that exposes them to the possibility of incarceration can negatively impact a child's living environment and emotional well-being. *In re S.M.L*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Viewing the evidence in the light most favorable to the trial court's finding, particularly Father's lengthy criminal history, repeated incarcerations, and domestic-violence convictions, we conclude that the trial court could have formed a firm belief or conviction that Father had knowingly allowed Alexa to remain in conditions which endangered her physical or emotional well-being and that he had engaged in conduct which endangered Alexa's physical or emotional well-being in violation of subsections 161.001(b)(1)(D), and (E). *See In re J.O.A.*, 283 S.W.3d at 344 (citing *In re J.F.C.*, 96 S.W.3d at 266). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Father had knowingly allowed

28

Alexa to remain in conditions which endangered her physical or emotional well-being and that he had engaged in conduct which endangered Alexa's physical or emotional well-being in violation of subsections 161.001(b)(1)(D) and (E). *See In re J.O.A.*, 283 S.W.3d at 345 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Because we conclude that the evidence is legally and factually sufficient to support the trial court's findings under sections 161.001(b)(1)(D) and (E), we do not address Father's arguments that the evidence is legally and factually insufficient to support the trial court's findings under subsection (O). *See In re P.W.*, 579 S.W.3d 713, 728 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

### c. Analysis as to Mother

Mother argues that the evidence is legally and factually insufficient to supports the trial court's finding that she committed a predicate act under subsections (D), or (E), or (O) of Article 151.001(b)(1).[6]

---

[6] We note that the trial court's judgment also found that Mother committed predicate acts under subsections (N) and (P), and Mother does not challenge those findings on appeal. Usually, an appellant must challenge all independent bases or grounds that fully support a judgment or appealable order. *See Blackstone Med., Inc. v. Phoenix Surgicals*, L.L.C., 470 S.W.3d 636, 650 (Tex. App.—Dallas 2015, no pet.); *Britton v. Tex. Dep't of Criminal Justice*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *see also In re N.L.D.*, 412 S.W.3d 810, 818 (Tex. App.—Texarkana 2013, no pet.) (holding that when parent failed to challenge on appeal ground for termination of parental rights, court could affirm on unchallenged ground without examining sufficiency of evidence to support challenged grounds). However, when raised on appeal, appellate courts must review challenges to subsections (D) and (E) because of the potential collateral consequences of a finding under those subsections. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019).

A parent's continuing substance abuse can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re J.O.A.,* 283 S.W.3d at 345; *see In re L.G.R.,* 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied). A parent's drug use exposes the child to the possibility the parent may be impaired or imprisoned and, thus, be unable to take care of the child. *Walker*, 312 S.W.3d at 617–18. The fact finder may give "great weight" to the "significant factor" of drug-related conduct. *L.G.R.,* 498 S.W.3d at 204.

A mother's use of drugs during pregnancy may be conduct that endangers the child. *In re A.S.*, 261 S.W.3d 76, 86 (Tex. App.—Houston [14th Dist.] 2008, pet. denied); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). However, termination is not automatic in such a case. *See A.S.*, 261 S.W.3d at 86 ("While unquestionably, an exercise of poor judgment, Veronica's use of marijuana on a single occasion, standing alone, does not rise to the level of a conscious course of conduct.").

This Court and others have held that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing the child, may support a finding to a clear and convincing degree that the parent engaged in conduct that endangered the child's physical or emotional well-being. *See In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016,

pet. denied); *In re A.H.A.*, No. 14-12-00022-CV, 2012 WL 1474414, at *7 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.); *In re M.E.-M.N.,* 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied).

Here, Mother has demonstrated no ability to become and remain consistently drug-free for any period of time. Every drug test she took from the time the Department became involved with her older children up until the time of trial was positive for illegal drugs.

The drug test evidence in this case showed that Mother first tested positive for illegal substances on July 7, 2017, three months before the Department sought to remove the children from her care. At the time, the test showed that she was a chronic cocaine user, which meant that she used cocaine daily. On February 6, 2018, mother tested positive for marihuana at a low level, methamphetamine, cocaine at a level indicating chronic usage, PCP at a level indicating usage approximately 3 times per week, plus chronic exposure to marihuana as well as low usage. On March 27, 2018, Mother again tested positive for cocaine, PCP, marihuana, and codeine. There was testimony that, because the levels of drugs were lower in this test than the previous test and the two tests were taken so close together, the results of the March 2018 might be showing residual usage. Also, the codeine could be explained by a prescription, but there is no prescription or evidence thereof in evidence. On July 10, 2018, just six weeks before Alexa was

born, Mother tested positive once again for cocaine. On September 11, 2018, shortly after Alexa's birth, Mother again tested positive for cocaine. On October 23, 2018, Mother tested positive for a low amount of alcohol, methamphetamine, cocaine, and PCP. This test indicated that sometime between July 2018 and October 2018, Mother again started using methamphetamine and PCP, which had not been detected in her system since February of that year. On November 27, 2018, Mother tested positive for cocaine, and, on February 20, 2019, she tested positive for cocaine, as well as daily exposure and a low ingestion of marihuana.

Mother's continued, consistent use of drugs, even after the Department filed suit to terminate her parental rights, is evidence of endangerment and that living in her household created an endangering condition. *See In re A.M.*, 495 S.W.3d at 580.

Additionally, neglect of a child's medical needs endangers the child. *Smith v. Tex. Dep't of Fam. And Protective Servs.*, No. 01-09-00173-CV. 2009 WL 4359267, at *7 (Tex. App.—Houston [1st Dist.] Dec. 3, 2009, no pet.); *In re T.M.T.*, No. 14-18-00442-CV, 2018 WL 6053667, at *11 (Tex. App.—Houston [14th Dist.] Nov. 20, 2018, no pet.) (mem. op.). A parent's failure to provide appropriate medical care for a child may constitute endangering conduct. *See In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *13 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.).

Here, there was evidence that, after Catherine was burned by spilled noodles, Mother refused to seek medical care for her. She told her other children that, if she did so, the doctor would cut off Catherine's legs. The resulting scars on Catherine's torso, groin, and upper legs were "knotted" and "snarled" and would require skin grafts in the future. Even though the child Mother medically neglected is not Alexa, the child involved in this proceeding, it is not necessary that the conduct be directed at the child that is the subject of the suit or that that the child actually suffer injury. *See Boyd*, 727 S.W.2d at 533.

Viewing the evidence in the light most favorable to the trial court's finding, particularly Mother's repeated failure of drug tests and medical neglect of Catherine, we conclude that the trial court could have formed a firm belief or conviction that Mother had knowingly allowed Alexa to remain in conditions which endangered her physical or emotional well-being and that she had engaged in conduct which endangered Alexa's physical or emotional well-being in violation of subsections 161.001(b)(1)(D), (E). *See In re J.O.A.*, 283 S.W.3d at 344 (citing *In re J.F.C.*, 96 S.W.3d at 266). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that Mother had knowingly allowed Alexa to remain in conditions which endangered her physical or emotional well-being, and that she had engaged in conduct which endangered Alexa's physical or emotional

well-being in violation of subsections 161.001(b)(1)(D) and (E). *See In re J.O.A.*, 283 S.W.3d at 345 (citing *In re J.F.C.*, 96 S.W.3d at 266).

Because we conclude that the evidence is legally and factually sufficient to support the trial court's findings under subsections (D) and (E), we do not address Mother's arguments that the evidence is legally and factually insufficient to support the trial court's findings under subsection (O). *See In re P.W.*, 579 S.W.3d at 728.

**3. Best Interest**

In his fourth issue, Father argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in Alexa's best interests. In her fifth and six issues, Mother raises the same claims.

**a. Applicable Law**

There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best interest finding: the desires of the

child; the present and future physical and emotional needs of the child; the present and future emotional and physical danger to the child; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). This list of factors is not exhaustive, however, and evidence is not required on all the factors to support a finding that terminating a parent's rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533.

In addition, the Texas Family Code sets out factors to be considered in evaluating the parent's willingness and ability to provide the child with a safe environment, including: the child's age and physical and mental vulnerabilities; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family

demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence when conducting the best interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both section 161.001(b)(1) grounds and best interest). A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also Jordan*, 325 S.W.3d at 724. A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d 462, 471 (Tex.

App.—San Antonio 2014, no pet.) (citing *In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2004, pet. denied)).

### b. Analysis as to Father

Regarding the child's desires, Alexa, an infant at the time of trial, was too young to express her desires. However, she had been placed in a foster home, in which she was doing well, and her needs were being met. In fact, her foster placement was a potential adoptive placement. The trial court could infer from this evidence that the child wanted to remain with her foster family. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent.").

In contrast, Father was confined in jail when Alexa was born in August 2018, and he was not released until November of 2018. Father did not meet Alexa until February or March of 2019. Even though there was evidence that Father visited Alexa regularly thereafter and had "started to build a bond" with her, the trial court could have concluded that this newly developed bond was not outweighed by the consistent, positive presence that Alexa's foster family provided.

Regarding Alexa's emotional and physical needs now and in the future, and the possible emotional and physical danger to her now and in the future, the trial court had evidence of Father's repeated criminal activity and resulting incarcerations. *See generally In re O.N.H.*, 401 S.W.3d at 684 (stating that past conduct is probative of future conduct when evaluating child's best interest). The trial court could have concluded that Father's pattern of repeated incarcerations shows that he "was not willing and able to provide the child with a safe environment—a primary consideration in determining the child's best interest." *See In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Indeed, the evidence shows that Father was incarcerated both when his eldest daughter, Catherine, was burned and suffered medical neglect by Mother, and when Alexa was born. There was also evidence that Father used drugs, even when his parental rights were in jeopardy. Additionally, Father had admitted that termination of parental rights was in the best interest of his older daughter, Catherine, and he voluntarily relinquished his parental rights to her. Father admitted to, and was convicted of, family violence against Mother. *See Walker*, 312 S.W.3d at 619 (considering father's past violence in best-interest assessment and noting that evidence of endangering conduct under Subsection (E) is also probative of best-interest analysis). Finally, Father continued using illegal drugs, even just a short time before a trial was set to determine his parental rights.

Regarding parental abilities, Father had shown no parental abilities. He was never a stable factor in either of his children's lives. And, although he indicated that he would like to pay child support for Alexa, there is nothing in the record to show that he had ever done so. Father also admitted that termination would be in the best interest of Catherine, thus indicating his unwillingness to be a parent to at least one of his children. Father had also not completed the parenting classes required by his family service plan. In contrast, Alexa was happy, healthy, and thriving in her foster home, and her foster mother hoped to adopt her, and perhaps Catherine, too.

Regarding plans for the child, Father offered none other than his willingness to visit Alexa and pay child support. He did not provide evidence of a home or a plan to provide Alexa with a home. In contrast, the Department testified about several potential permanent homes for Alexa. First, the foster mother was willing to adopt Alexa. Second, Danielle Green, whose children shared a father with two of Alexa's siblings, testified that she was willing to consider adopting all six children. And, finally, the Department had located a family that was willing to adopt all six siblings if the parents' parental rights were terminated. The trial court could infer from this evidence that the Department's plans were more likely to ultimately to provide Alexa with a stable, safe, and permanent home, which is a

paramount consideration in a court's best-interest determination. *See* TEX. FAM. CODE § 263.307(a); *see also In re K.C.*, 219 S.W.3d at 931.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Father's parental rights is in Alexa's best interests. *See In re J.O.A.*, 283 S.W.3d at 344 (citing *In re J.F.C.*, 96 S.W.3d at 266). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Fathers parental rights is in Alexa's best interests. *See In re J.O.A.*, 283 S.W.3d at 345 (citing *In re J.F.C.*, 96 S.W.3d at 266). Accordingly, we hold that legally and factually sufficient evidence supports the trial court's best interest finding.

We overrule Father's fourth issue.

### c. Analysis as to Mother

Regarding the child's desires, Alexa, an infant at the time of trial, was too young to express her desires. However, she had been placed in a foster home, in which she was doing well, and her needs were being met. In fact, her foster placement was a potential adoptive placement. The trial court could infer from this evidence that the child wanted to remain with her foster family. *See In re J.D.*, 436 S.W.3d at 118 ("When children are too young to express their desires, the fact

40

finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent.").

In contrast, Mother lost custody of her older children before Alexa was born and Alexa, too, was removed shortly after her birth. Although Mother had bonded with her older children before they were removed and continued to visit Alexa even after she was removed, the trial court could have concluded that her bond with Alexa was lacking because Alexa was removed from her custody as an infant.

Regarding Alexa's emotional and physical needs now and in the future and the possible emotional and physical danger to her now and in the future, the trial court had evidence of Mother's continuing drug abuse. *See generally In re O.N.H.*, 401 S.W.3d at 684 (stating that past conduct is probative of future conduct when evaluating child's best interest). The trial court could have concluded that Mother's pattern of drug abuse shows that she "was not willing and able to provide the child with a safe environment—a primary consideration in determining the child's best interest." *See In re A.C.*, 394 S.W.3d at 642. The evidence shows that Mother tested positive for illegal drugs before her children were removed from her care and thatshe continued to test positive for drugs up to the time of trial, even when her parental rights were in jeopardy. Indeed, she used drugs while pregnant with Alexa. Mother also demonstrated an inability to provide for her children's

emotional and physical needs, and indeed, subjected Catherine to danger when she refused to seek medical treatment for Catherine's burns.

Regarding parental abilities, Mother's parental skills were demonstrably lacking, as indicated by her refusal to seek medical care for her severely burned child. Mother, in fact, was willing to turn over her parental rights to Danielle Green, a woman whom she did not know, before her children were removed. There was also evidence that Mother hid the children from the Department, keeping the eldest ones out of school, even though they were school-aged. The trial court could also have concluded that Mother's parenting skills were compromised by her continuing drug abuse. There was evidence that she left the children with a babysitter in an apartment with no heat or water in January. Because Mother's eldest children were concerned that, if placed in a home with their siblings, they would become caregivers again, the trial court could have concluded that, in the past, Mother had left the younger children in the care of the older children.

Regarding plans for the child, Mother offered none, though there was evidence that she would consider relinquishing custody of all six children to Danielle Green, a woman whom she did not know. Mother did not provide evidence of a home or a plan to provide Alexa or the other children with a home. In contrast, the Department testified about several potential permanent homes for Alexa. First, the foster mother was willing to adopt Alexa. Second, Danielle

Green, whose children shared a father with two of Alexa's siblings, testified that she was willing to consider adopting all six children. And, finally, the Department had located a family that was willing to adopt all six siblings if the parents' parental rights were terminated. The trial court could infer from this evidence that the Department's plans were more likely to ultimately provide the children with a stable, safe, and permanent home, which is a paramount consideration in a court's best-interest determination. *See* TEX. FAM. CODE § 263.307(a); *see also In re K.C.*, 219 S.W.3d at 931.

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of Mother's parental rights is in Alexa's best interests. *See In re J.O.A.*, 283 S.W.3d at 344 (citing *In re J.F.C.*, 96 S.W.3d at 266). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights is in Alexa's best interests. *See In re J.O.A.*, 283 S.W.3d at 345 (citing *In re J.F.C.*, 96 S.W.3d at 266). Accordingly, we hold that legally and factually sufficient evidence supports the trial court's best interest finding.

We overrule Mother's fifth and sixth issues.

## B. DENIAL OF RIGHT TO COUNSEL

In issue three, Mother contends that she did not receive her statutorily protected assistance of counsel at trial because her retained counsel, Gary Smotherman, II, did not appear on either day of trial. We agree.

As the Texas Supreme Court has recently stated, "Parents face a complex and nuanced family-law system that is challenging to navigate without the guidance of counsel." *In re B.C.*, No. 19-306, ___ S.W.3d ___, 2019 WL 6972235, at *4 (Tex. Dec. 20, 2019). "Considering the importance of the fundamental rights at issue, the Legislature has adopted important safeguards in sections 107.013 and 263.0061 [of the Family Code] to help ensure parents will not be deprived of their parental rights without due process of law." *Id.*

Section 107.013 provides that the trial court shall appoint an attorney to represent the interests of an indigent part in a termination-of-parental-rights case filed by a governmental entity. TEX. FAM. CODE § 107.013(a)(1). In such a case, the trial court shall, at the parent's first appearance in court, inform the parent of the right to be represented by an attorney, and, if the parent is indigent, the right to have an attorney appointed by the court. *Id.* § 107.013(a-1)(1), (2). A parent is then required to initiate the indigency process by filing an affidavit of indigency, after which, the trial court determines whether the parent is indigent and entitled to appointed counsel. *Id.* § 107.013(d).

44

Section 263.0061 provides:

(a) At the status hearing under Subchapter C and at each permanency hearing under Subchapter D held after the date the court renders a temporary order appointing the department as temporary managing conservator of a child, the court shall inform each parent not represented by an attorney of:

   (1) the right to be represented by an attorney; and

   (2) if a parent is indigent and appears in opposition to the suit, the right to a court-appointed attorney.

TEX. FAM. CODE § 263.0061(a)(1), (2).

In *In re B.C.*, the Texas Supreme Court addressed the protections provided by these statutes. 2019 WL 6972235, at * 2-4. In that case, the mother, who appeared at her first hearing without counsel, was admonished regarding her right to counsel and told that, if she was indigent and wanted appointed counsel, she would have to fill out "some forms." *Id.* at *1. She then appeared at every permanency hearing thereafter, and proceeded to trial, without counsel. *Id.* On appeal, she claimed, among other things, that she was denied her statutory right to appointed counsel. *Id.*

The supreme court first noted that the trial court had properly admonished the mother at her initial appearance without counsel, and that mother had not filed an affidavit of indigency. *Id.* at *3. Thus, under existing case law, the mother was not entitled to the appointment of counsel. *Id.* However, the supreme court further concluded that the mother's "failure to file an affidavit of indigence is not

45

dispositive because the trial court failed to properly admonish her as required by section 263.0061." *Id.* In so holding, the supreme court stated, "At the status hearing and at each permanency hearing after the Department is appointed temporary managing conservator, trial courts must inform unrepresented parents about their right to legal representation, including the right to court-appointed counsel." *Id.* Because the Mother had appeared unrepresented at the permanency hearing before trial, and then proceeded to trial unrepresented, at which time "her relationship with her child was permanently severed," the supreme court concluded that "noncompliance with section 263.0061 was not harmless and reversal [was] required." *Id.*

We believe that the holding of *In re B.C.* applies equally to this case. The record shows that Mother was present with her attorney at hearings on September 11, 2018, and on October 23, 2018. On February 19, 2019, neither Mother nor her attorney in the 2018 case were present, although her attorney in the 2017 case was present. The docket sheet notes that "[a]ttorney representing motion in the other action (2018 cause), Mr. Smotherman, was noticed, but not present per department, mother not present." On April 9, 2019, Smotherman was again not present, but Brown, Mother's attorney in the 2017 cause, was. On the date of the June 25, 2019 trial setting, counsel for the Department stated on the record,

> "Your Honor, Mr. Gary Smotherman is the attorney of record for the mother on the 2018-59296 cause. He has been noticed of this trial setting as he has

for every other setting. He did appear for the mother. And at the show cause hearing on September 11th of 2018, and also October 23rd of 2018, and he is not present. I asked mother earlier in the day to call him and ask him when he would be here. She's not heard from him is my understanding.

The trial court then made no further inquiries of Mother, nor did it advise her of her right to have counsel present. Instead, the trial court stated, "Okay, You may proceed."

Again, at the July 1, 2018 trial date, the Department's counsel noted:

I would just ask the Court to take judicial notice of our notice of resumption of recess trial setting that was filed on Thursday afternoon that notices Gary Smotherman in the 2018 cause. He is mother's attorney of record. He's been noticed. He is not present at this time."

The trial court responded, "The Court will take judicial notice of the 6/27/2019 notice of resumption of the recessed trial setting as to Mr. Smotherman is on file[.]" The trial court did not inquire of Mother regarding Mr. Smotherman's absence, nor did it admonish Mother of her right to counsel.

We hold that, as in *B.C.*, the trial court failed to comply with the protections provided in section 263.0061 by failing to properly admonish Mother, who was unrepresented at both the February 2019 hearing,[7] the April 9, 2019 hearing, and the subsequent June and July 2019 trial dates, of her right to counsel. *See B.C.,* 2009 6972235, at *3.

---

[7] We acknowledge that the trial court could not have admonished Mother at the February 2019 hearing because she, too, was not present on that date.

47

The Department nevertheless argues that error, if any, was harmless because "K.H. fails to acknowledge that both [this case and the 2017 case] were tried together and the same evidence and testimony was adduced as to both[,]" and that "[h]er attorney who represented her in the case involving the five older children was present at each trial proceeding and represented [Mother] throughout the entirety of each proceeding."

However, Mother's attorney in the 2017 case made it clear that he did not represent Mother in the 2018 case, stating at the June trial date, "On [the 2017 case] I entered an appearance; on the [2018 case] I'm not the attorney of record." Again, at the July trial date, Mother's attorney in the 2017 case appeared, stating, "My name is Jimmie Brown. I represent [Mother] in the 2017 matter, not in the other matter . . . ." While the same evidence may have been presented in both the 2017 and 2018 cases, we cannot say, as a matter of law, that different issues could not have been raised in each case. Mr. Brown certainly made it clear to the trial court that he was not responsible for the presentation or defense of the 2018 case.

Because, after her initial appearances with counsel, Mother appeared without counsel at both hearings and at trial, and the trial court never again admonished her of her right to counsel, we sustain Mother's third issue.

**C. CONCLUSION IN CAUSE NO. 2018-59296**

Having found the evidence legally and factually sufficient to support the termination of Father's parental rights to Alexa under Family Code § 161.001(b)(1)(D) and (E) and § 161.001(b)(2), we affirm the trial court's Final Decree for Termination as to him. However, having overruled Mother's sufficiency challenges, but having determined that Mother was not properly advised of her right to counsel under Family Code § 263.006, we reverse the trial court's Final Decree for Termination as to her and remand the case for a new trial. *See B.C.*, 2019 WL 6972235, at *4. In light of our disposition of Mother's third issue on appeal, we need not address the remaining issues in this cause number, which would grant her no more relief than that we have already afforded her.

### III. CAUSE NO. 2017-65076

**A. JURISDICTION**

In issue two, Mother contends that the trial court's termination decree is void for want of jurisdiction because the trial court did not proceed to trial within the timetable set forth in Family Code section 263.401. *See* TEX. FAM. CODE § 263.401. We address this issue first because it raises an issue of subject-matter jurisdiction. *See id.*

Regarding timetables for commencing trials in parental-termination cases, the Family Code provides in relevant part:

(a) Unless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1) on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction  over the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child is terminated and the suit is automatically dismissed without a court order.  Not later than the 60th day before the day the suit is suit is automatically dismissed, the court shall notify all parties to the suit of the automatic dismissal date.

(b) Unless the court has commenced the trial on the merits, the court may not retain the suit on the court's docket after the time described by Subsection (a) unless the court finds that extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child.  If the court makes those findings, the court may retain the suit on the court's docket for a period not to exceed 180 days after the time described by Subsection (a) . . . .

*Id.* § 263.401(a), (b).

The record shows that the Department was appointed Temporary Managing Conservator of the children[8] on October 17, 2017.  Thus, under the statute, the initial deadline for commencement of trial was the first Monday after the one-year anniversary of that date, October 22, 2018.

---

[8] The record shows that the Department was not made Temporary Managing Conservator of the baby, Alexa, until September 11, 2018, less than one year before trial in 2019.  Thus, this issue was not addressed in the 2018 cause number.

However, the record shows that, on October 9, 2018, while the trial court had jurisdiction, it signed an "Order Retaining Suit on Court's Docket and Setting Hearing Dates." This order found that "extraordinary circumstances necessitate the subject child remaining in the temporary managing conservatorship of the Department" and extending the timetable until April 17, 2019, which is within the 180-day extension period permitted by section 263.401(b).

Nevertheless, Mother contends that the hearing on April 9, 2019, which was within the requisite timetable, was not a commencement of trial, but was "a strategy used by [the Department] to justify the failure to adhere to the dismissal deadline . . . ."

This Court has considered what constitutes a trial "commencement" for purposes of § 263.401. *See In re R.J., Jr.*, 579 S.W.3d 97 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). In *R.J., Jr.*, the case was called to trial, the parties made announcements, the witnesses were sworn, several attorneys announced "ready," and then there was a discussion regarding a late-filed intervention. 579 S.W.3d at 109. The trial court then instructed the Department to call its first witness, which it did. *Id.* The witness, the Department's caseworker, testified briefly before the trial court recessed. *Id.* On appeal, the parents argued that the trial did not commence on that date because they were instructed that they did not need to be present; indeed, the intervenors were not in court. *Id.* at 109–10. This

51

Court rejected the parents' argument, and "conclude[d] that the record contains sufficient information to establish that trial on the merits commenced on [that day]." *Id.* at 110.

In this case, the trial court called the case and asked the attorneys to state their name and who they represented. The Court then considered several preliminary matters, including a motion to withdraw, the fact that the Department had a pending motion to compel, and that Mother had apparently just filed a relinquishment of her rights to the children. Finally, the court considered the fact that there was an allegation that the Mother, Father, and one of the other fathers had claimed that they might be of Cherokee descent. The court and the attorneys present discussed whether there had been compliance with the Indian Child Welfare Act of 1978, which required notice to the tribe. The Department's counsel stated:

> We have sent the notices to the tribes in the Bureau of the Indian Affairs. I have the registered mail receipts returns that show those were received on April 4th. My understanding of the Federal regulations is the tribe [has] and the Bureau has a reasonable amount of time to reply. The regs say 15 days. So[,] I don't believe that April 4th gets us to 15 days today.
>
>     * * * *
>
> I would suggest to the Court or ask for leave of the Court to commence trial today as to [Father's] matter and then—as he's waiving his concern [about compliance with the ICWA as to him only] and then come back at a time very shortly from now in order to give the tribes time to let us know.

I don't—because we've done our diligence, we've talked to the relatives in these cases when we can; we've not found any evidence that they're actually registered. I don't anticipate this will be a problem, but I think we have to wait.

All attorneys present agreed that Father could testify because he was waiving his claim of Cherokee heritage, but that proceeding further would be problematic.

Thereafter, Father was called to the stand, sworn in, and testified that he was filing an Irrevocable Affidavit of Voluntary Relinquishment as to his older child, Catherine. He testified that he understood the relinquishment and felt that it would be in the child's best interest. His affidavit was then admitted into evidence. The case was then recessed and resumed on June 25, 2019.

We believe that, as in *R.J., Jr.*, trial commenced on April 9, 2019, when the case was called, the parties made their announcements, a witness was sworn, and evidence was received by the trial court. We do not agree with Mother's assertion that the recess was "a strategy used by [the Department] to justify the failure to adhere to the dismissal deadline." The record shows that the trial court had legitimate concerns with proceeding with hearing evidence relating to the parties claiming Cherokee descent, so, instead, allowed Father to testify and present evidence because there was no issue as to him.

Under these circumstances, as in *R.J., Jr.*, there was sufficient information in the record to show that the trial court commenced trial on April 9, 2019, which was within the statutory deadline.

We overrule Mother's issue two.

## B. SUFFICIENCY OF THE EVIDENCE

In issues four, five, and six, Mother argues that there is legally and factually insufficient evidence supporting the trial court's findings that she committed the predicate acts under subsection 161.001(b)(1)(D), (E), and (O) and that termination of her parental rights is in the children's best interests. *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E), (O), 161.001(b)(2).

Because both the 2018 and 2017 causes were tried together, and the same evidence was presented in both causes, we overrule issues four, five, and six, for the same reasons given above in the 2018 cause number.

## C. DUE PROCESS AND EQUAL PROTECTION

In a multifarious issue one, Mother contends that she was denied due process and equal protection because (1) the presiding and associate judges should have been recused, (2) the ad litem for the children should have been disqualified and removed, (3) the Department violated provisions of the Indian Child Welfare Act, and (4) she was not permitted an opportunity to visit her children because the Department did not develop an appropriate visitation plan.

However, to preserve a complaint for appellate review, the record must show that the complaint was made to the trial court, and that the trial court either ruled on the complaint or refused to rule and the complaining party objected to the trial court's refusal to rule. *See* TEX. R. APP. 33.1. If a party fails to do this, error is not preserved, and the complaint is waived. *See Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991). The record in this case does not show any rulings on these complaints; thus, the issues are waived.[9]

We overrule issue one.

## D. INEFFECTIVE ASSISTANCE OF COUNSEL

In her ninth issue, Mother contends that she received ineffective assistance of counsel because her "attorney in the 2017 case was forced to represent [her] after filing a motion to withdraw."

At the June 2019 trial date, Mother's counsel, Jimmie Brown, Jr., filed a Motion to Withdraw, alleging "a pretty much unavoidable conflict of interest." After a brief discussion off the record, the trial court denied Brown's motion. Brown then stated on the record,

---

[9] To the extent that Mother claims that the docket sheet shows that motions raising these issues were denied, we note that "a docket entry may not take the place of an order or judgment." *Pickell v. Guar. Nat. Life Ins. Co.*, 917 S.W.2d 439, 441 (Tex. App.—Houston [14th Dist.] 1996, no writ). Likewise, a docket sheet is not part of the record on appeal and cannot be relied on to preserve error. *Mason v. Randall's Food Markets, Inc.*, 01-01-00199-CV, 2001 WL 1344355, at *1 (Tex. App.—Houston [1st Dist.] Nov. 1, 2001, no pet.).

Based on what has occurred between my client and myself, Counsel will be basically ineffective. And I think that will render this proceeding pretty much constitutionally [infirm]. I don't know of any other way that I can proceed and not prejudice my client one way or another. And I don't know how I can do this and be faithful to the rules that I'm sworn to uphold. So all I can honestly tell the Court is that I will be ineffective on the record.

Mother contends that, thereafter, Brown was ineffective because he "failed to object to any of the evidence and exhibits and failed to object to hearsay and calls for speculation," and "[n]o defense was mounted for [Mother] in the trials of June 25, and July 1, 2019."

## 1. Standard of Review and Applicable Law

The statutory right to counsel in parental-rights termination cases includes, as a matter of due process, the right to effective counsel. *C.S.F. v. Texas Dep't of Family & Protective Servs.*, 505 S.W.3d 618, 619 (Tex. 2016) (citing *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003)). Proving ineffective assistance of counsel requires showing: (1) commission of errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment, and (2) that counsel's deficient performance prejudiced the defense—i.e., "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *M.S.*, 115 S.W.3d at 545 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We must determine "whether counsel's defective performance caused harm; in other words, whether 'there is a reasonable probability that, but for

counsel's unprofessional error(s), the result of the proceeding would have been different.'" *Id.* at 549–50 (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). "Thus, an ineffective assistance of counsel claim requires a showing of a deficient performance by counsel so serious as to deny the defendant a fair and reliable trial." *In re J.O.A.*, 283 S.W.3d at 342. An assertion of ineffective assistance will be sustained only if the record affirmatively supports such a claim. *Lockwood v. Texas Dep't of Family & Protective Servs.*, No. 03-12-00062-CV, 2012 WL 2383781, at *5 (Tex. App.—Austin June 26, 2012, no pet.) (mem. op.). The parent has the burden to prove by a preponderance of the evidence that counsel was ineffective. *A.C. v. Texas Dep't of Family & Protective Servs.*, 577 S.W.3d 689, 707 (Tex. App.—Austin 2019, pet. denied); *In re P.M.W.*, 559 S.W.3d 215, 218 (Tex. App.—Texarkana 2018, pet. denied).

"With respect to whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case and must primarily focus on whether counsel performed in a 'reasonably effective' manner." *M.S.*, 115 S.W.3d at 545. "[C]ounsel's performance falls below acceptable levels of performance when the 'representation is so grossly deficient as to render proceedings fundamentally unfair[.]'" *Id.* (quoting *Brewer v. State*, 649 S.W.2d 628, 630 (Tex. Crim App. 1983)). "In this process, we must give great deference to counsel's performance, indulging 'a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance,' including the possibility that counsel's actions are strategic." *Id.* (quoting *Strickland*, 466 U.S. at 689). "It is only when 'the conduct was so outrageous that no competent attorney would have engaged in it,' that the challenged conduct will constitute ineffective assistance." *Id.* (quoting *Garcia*, 57 S.W.3d at 440); *Thompson v. State*, 9 S.W.3d 808, 812–13 (Tex. Crim. App. 1999). "Ordinarily, counsel should not be condemned as unprofessional or incompetent without an opportunity to explain the challenged actions." *In re S.L.*, 188 S.W.3d 388, 395 (Tex. App.—Dallas 2006, no pet.) (citing *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002)). "Thus, when the record is silent regarding counsel's reasons for his conduct," as it is here, "we defer to counsel's decision if there is at least the possibility that the conduct could have been legitimate trial strategy." *Id.* (citing *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002)). Stated another way, if counsel "may have acted in accordance with a plausible strategy," we will not find counsel's conduct deficient. *In re L.G.R.*, 498 S.W.3d 195, 209 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

### 2. Analysis

Here, there is nothing in the record to show why Brown stated to the trial court that he would be ineffective if his motion to withdraw were not granted. The discussion with the trial court was off the record, and this Court will not speculate

as to the reasons for Brown's statements. We cannot conclude that Brown was ineffective merely because he stated that he would be. Instead, we look at the totality of his representation to determine whether he was ineffective.

Regarding Mother's claim that Brown "failed to object to any of the evidence and exhibits" and mounted "no defense" for her, the record does not support this claim. In fact, the record shows that Brown objected numerous times for hearsay, speculation, leading questions, testimony outside the witness's expertise, vagueness, and several others. He cross-examined the Department regarding Mother's criminal record and argued that she could not be responsible for not maintaining contact with her older children when she was prohibited by the Court from visiting them. Mother does not point to anything in the record to suggest that Brown did not have a plausible trial strategy for his objections or any lack of objections or that, had he conducted himself at trial differently, the result would have been different.

Mother further claims that Brown was ineffective because he did not object to the lack of a timely commencement of trial. However, we have already determined that trial was timely commenced at the on April 9, 2019, when Father was called to the stand, sworn, and presented evidence. Thus, Brown's failure to object to the commencement of trial was not ineffective.

Finally, Mother contends that Brown was ineffective because he did not object to the associate judge hearing the proceedings or to alleged violations of the Indian Child Welfare Act. However, the record does not show any violation of the Indian Child Welfare Act. And, Mother does not show that hearing the case before the associate judge was not a valid trial strategy or that, had the case been heard by the presiding judge, the result would have been different.

We overrule issue nine.

## E. DENIAL OF INTERVENTION AND VIOLATION OF FOSTERING CONNECTIONS ACT

In issue eight, Mother argues that the Department's "denial of the intervention and failure to consider relative placement is a violation of [Mother's] constitutional rights as well as a violation of [the] Fostering Connections Act."[10]

Other than a single citation to a dissent in *In re B.D.A.*, 546 S.W.3d 376–77 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (Massengale, J., dissenting), that mentions the goals of the Fostering Connections Act, Mother provides no legal authority or analysis to support her claim that the Act was violated in this case. *See* TEX. R. APP. P. 38.1(i) (appellant's brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and to record). "Rule 38 requires [a party] to provide us with such discussion of the facts and the

---

[10] Presumably, Mother is referencing the federal Fostering Connections to Success and Increasing Adoptions Act. *See* Pub. L. No. 110–351, 122 Stat. 3949 (2008) (codified as amended in scattered sections of Title 42 of the United States Code).

authorities relied upon as may be requisite to maintain the point at issue." *Tesoro Petroleum Corp. v. Nabors Drilling USA, Inc.*, 106 S.W.3d 118, 128 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). Because issue eight is inadequately briefed, we conclude that it is waived. *See Dauz v. Valdez*, 571 S.W.3d 795, 805 (Tex. App.— Houston [1st Dist.] 2018, no pet.); *Izen v. Comm'n for Lawyer Discipline*, 322 S.W.3d 308, 321–22 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

## F. APPOINTMENT OF DEPARTMENT AS SOLE MANAGIING CONSERVATOR

In issue seven, Mother contends that there is legally and factually insufficient evidence to support the appointment of the Department as sole managing conservator of the children.

When the parents' rights are terminated, the trial court must appoint "a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *see In re M.M.M.*, No. 01-16-00998-CV, 2017 WL 2645435, at *17 (Tex. App.—Houston [1st Dist.] June 16, 2017, no pet.) (mem. op.). We review conservatorship determinations for an abuse of discretion and will reversed one only if the trial court's decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616, (Tex. 2007); *see also A.C.*, 394 S.W.3d at 644.

An order terminating the parent-child relationship divests the parent of all legal rights and duties with respect to the child. TEX. FAM. CODE § 161.206(b).

Once we overrule a parent's challenge to a termination order, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination pursuant to Family Code section 161.207." *In re A.S.,* 261 S.W.3d 76, 92 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Because we have overruled Mother's challenges to trial court's order terminating her parental rights in the 2017 case, the order has divested Mother of her legal rights and duties related to Anna, Bryan, Catherine, Deborah, and Elijah. *See* TEX. FAM. CODE § 161.206(b); *In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). As a result, Mother does not have standing to challenge the portion of the order appointing the Department as permanent managing conservator of the children because any alleged error could not injuriously affect her rights. *D.K.W., Jr.*, 2017 WL 6520439, at *5.

We overrule Mother's sixth issue on appeal.

**G. CONCLUSION IN CAUSE NO. 2017-65076**

Having overruled all of Mother's issues, we affirm the trial court's Final Decree for Termination in cause number 2017-65076.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Kelly and Goodman.